IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 11-83 |
| DONALD HELLINGER, ET AL. | : | |

**SURRICK, J.**                                                                                      **SEPTEMBER 18, 2012**

## MEMORANDUM

Presently before the Court are the Government's and Defendants' Objections to the Sentencing Guidelines Calculations in Pre-Sentence Investigation Reports.

### I.      BACKGROUND

On February 10, 2011, a grand jury in the Eastern District of Pennsylvania issued a fourteen-count Indictment against Defendants Donald Hellinger, Ronald Hellinger, Michael Weisberg, Randy Trost, Jami Pearlman and Michele Quigley. (Indictment, ECF No. 1.) The Indictment charged the Defendants with: one count of conspiracy, in violation of 18 U.S.C. § 371; one count of operating an illegal money transmission business, in violation of 18 U.S.C. § 1960; one count of operating an illegal gambling business, in violation of 18 U.S.C. § 1955; eight counts of transmission of wagers and wagering information, in violation of 18 U.S.C. § 1084; and three counts of international money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A). (Indictment.)   The criminal conduct in this case was discovered in the course of a civil investigation conducted by the United States Department of Justice into Payment Processing Center, LLC ("PPC"). Defendants were all owners, directors, supervisors or managers of PPC. (*See United States v. Payment Processing Ctr., LLC et al.*, Civ. No. 06-725, E.D. Pa.)

Between February 28 and March 2, 2012, five Defendants—Donald Hellinger, Ronald Hellinger, Weisberg, Trost and Quigley—entered pleas of guilty to Count 2 of the Indictment. (Min. Entries, ECF Nos. 99, 101, 106, 110, 113.)[1] Count 2 specifically charged Defendants with knowingly owning, conducting, managing or directing an unlicensed money transmitting business. The parties all agree that the money that was transmitted by Defendants was money derived from illegal gambling. The plea agreements reached between Defendants and the Government provide that the total amount of illegal gambling money that was transmitted through PPC was $44,000,000. (D. Hellinger Plea Agreement 4, ECF No. 102; *see also* Trost Plea Agreement 4, ECF No. 100; R. Hellinger Plea Agreement 4, ECF No. 108; Weisberg Plea Agreement 4, ECF No. 111; Quigley Plea Agreement 4, ECF No. 114 (collectively, "Plea Agreements").)

The United States Probation Office prepared Pre-Sentence Investigation Reports ("PSRs") as to each of the Defendants. These PSRs assess base offense levels of 30, based upon Section 2S1.1(a)(2) of the United States Sentencing Guidelines ("Guidelines").

Defendants object to the PSRs' assessment of their base offense level under U.S.S.G. § 2S1.1(a)(2), and argue that their base offense levels should be calculated to reflect the underlying criminal conduct, as provided by U.S.S.G. § 2S1.1(a)(1). (D. Hellinger Sent. Mem. 18; R. Hellinger Sent. Mem. 14-15; Quigley Sent. Mem. 2; Trost Sent. Mem. 2.)[2] The Government

---

[1] Proceedings against Pearlman are presently on hold because of her medical condition.

[2] In his written submissions to the Court, Weisberg did not formally join in this objection to the PSR. Weisberg's counsel indicated that she "would like to adopt the legal argument of other defense counsel in this matter." (Sept. 10, 2012, Hr'g Tr. 30.) In the interests of justice, we will construe this objection as timely. *See* Fed. R. Crim. P. 32(i)(1)(D) (permitting a sentencing court to, "for good cause, allow a party to make a new objection at any time before

initially contended that the PSRs' assessment is correct, and that Defendants' Guidelines range should be calculated under subsection (a)(2). (*See, e.g.*, Gov't's Sent. Mem. for D. Hellinger ("Gov't's Sent. Mem."[3]) 8-9, ECF No. 144.)[4] The Government now argues that the correct Guideline is § 2S1.3.

On July 18, 2012, the Government filed sentencing memoranda.[5] (ECF Nos. 144-148.) Defendants filed their sentencing memoranda on July 20, 2012. (D. Hellinger Sent. Mem., ECF No. 149; Quigley Sent. Mem., ECF No. 150; R. Hellinger Sent. Mem., ECF No. 151; Trost Sent. Mem., ECF No. 161.) Weisberg filed a sentencing memorandum, by letter to the Court, on September 6, 2012. On September 10, 2012, the Government and Defendants submitted a Stipulation outlining the nature of PPC's gambling-related conduct. The Stipulation states:

> The United States of America, by and through its undersigned counsel, Zane David Memeger, United States Attorney for the Eastern District of Pennsylvania, and Joel M. Sweet, Assistant United States Attorney for the same district, and defendants Donald Hellinger, Ronald Hellinger, Michael Weisberg, Randy Trost, and Michele Quigley, by and through their respective attorneys, for the purpose of establishing facts to assist the Court in deciding the applicable sentencing guidelines, **AGREE** and **STIPULATE** as follows:

---

sentence is imposed").

[3] The Government's sentencing memoranda treat the five Defendants identically with regard to the issues discussed in this Memorandum. In the interest of brevity, we will not cite to each individual Government sentencing memorandum.

[4] Although not discussed in the memoranda, the PSRs apply a four-point enhancement pursuant to U.S.S.G. § 2S1.1(b)(2)(C), on the grounds that Defendants were "in the business of laundering funds." (D. Hellinger PSR ¶ 48.) Since an enhancement under (b)(2)(C) only applies "if subsection (a)(2) applies," we construe Defendants' challenge to the PSRs' (a)(2) determination as a challenge to the PSRs' (b)(2)(C) determination as well.

[5] Except when stipulated otherwise, we use "Defendants" to refer to the five convicted Defendants only. Defendant Jami Pearlman has entered a plea of not guilty.

1. Payment Processing Center, LLC ("PPC") processed payments on behalf of offshore Internet gambling companies.

2. In this regard, PPC engaged in the following activities:

   a. receiving into PPC's bank accounts wire transfers from offshore gambling companies;

   b. receiving by email from offshore gambling companies information concerning bettors' identities, addresses, and amounts of money due to bettors from the offshore gambling companies;

   c. at the direction of offshore gambling companies, preparing checks drawn on PPC's bank accounts and payable to bettors;

   d. at the direction of offshore gambling companies, preparing checks drawn on PPC's bank accounts and payable to vendors of the offshore gambling companies;

   e. at the direction of offshore gambling companies, causing the delivery of the checks.

3. PPC did not collect wagers, operate gambling internet sites, calculate gambling winners or losers, or participate in the gambling business unrelated to the transmission of money from the offshore gambling companies to the bettors and vendors.

(Stipulation, ECF No. 162.)

A hearing was held on Defendants' Objections to the Guideline Calculations on September 10, 2012. Defendants submitted a letter-brief on September 12, 2012 dealing with the issue of whether U.S.S.G. § 2S1.3 could apply in this case. (Defs.' Supp. Mem., ECF No. 164.)[6] The Government responded with a letter-brief on that same issue. (Gov't's Supp. Mem., ECF No. 170.)[7] On September 12, 2012, Defendants filed a response to the Government's letter-brief.

---

[6] For the convenience of counsel and because of time constraints, the Court has permitted counsel to submit letter-briefs in support of their positions. Those letter-briefs will be made a part of the record.

[7] The Government's Sentencing Memorandum (Gov't's Sent. Mem., 21 n. 4) contains a footnote that suggests that § 2S1.3 may apply. The Government also claims that it suggested, at

(Defs.' Resp., ECF No. 173.)

The statutory maximum sentence for violation of 18 U.S.C. § 1960 is five years imprisonment and a $250,000 fine.

## II.     LEGAL STANDARD

The Federal Rules of Criminal Procedure require that the United States Probation Office "conduct a presentence investigation and submit a report to the court before" the imposition of the sentence. Fed. R. Crim. P. 32(c)(1)(A). The report must "(A) identify all applicable guidelines and policy statements of the Sentencing Commission; (B) calculate the defendant's offense level and criminal history category; (C) state the resulting sentencing range and kinds of sentences available," and identify factors relevant to sentencing and potential departures from the sentencing range. Fed. R. Crim. P. 32(d). After receipt of the PSR, the parties must, within fourteen days, "state in writing any objections" to the contents of the PSR. Fed. R. Crim. P. 32(f)(1).

The Supreme Court has ruled that the Guidelines are "effectively advisory," and that a sentencing court, while required "to consider Guidelines ranges," is permitted "to tailor the sentence in light of other statutory concerns as well." *United States v. Booker*, 543 U.S. 220, 245-46 (2005).

## III.    DISCUSSION

### A.     Waiver of Government's Objection

Defendants argue that the Government has waived its right to object to the PSRs'

---

a conference in chambers, that the Court could sentence Defendants under § 2S1.3. (Sept. 10, Hr'g Tr. 24.) Not all Defendants were represented at that conference.

Guidelines calculations because it did not file such objections within fourteen days of receiving the PSRs. (Defs.' Supp. Mem. 1.) The Government, while acknowledging that its objection is untimely, seeks the Court's permission to proceed. (Gov't's Supp. Mem. 1.)

Federal Rule of Criminal Procedure 32(f)(1) provides that "[w]ithin 14 days after receiving the presentence report, the parties must state in writing any objections" to the report. Fed. R. Crim. P. 32(f)(1). The Rule, however, permits a sentencing court to, "for good cause, allow a party to make a new objection at any time before sentence is imposed." Fed. R. Crim. P. 32(i)(1)(D). We have "broad discretion" to permit such objections. *United States v. Angeles-Mendoza*, 407 F.3d 742, 749 & n. 12 (5th Cir. 2005) ("The touchstone of rule 32 is reasonable notice to allow counsel adequately to prepare a meaningful response and engage in adversary testing at sentencing.") (citations omitted). It is clear that we are permitted to consider a new objection as late as the actual sentencing hearing. *See, e.g.*, *United States v. Heron*, 32 F. App'x 150, 158-59 (3d Cir. 2009); *United States v. Talisov*, 339 F. App'x 920, 927 (11th Cir. 2009) (district court's decision to entertain late objection was not erroneous since defendant's counsel professed readiness for hearing); *United States v. Young*, 140 F.3d 453, 457 (2d Cir. 1998) ("The sentencing court may impose sentencing enhancements belatedly suggested by the Government and not contained in the PSR, provided the defendant is afforded an adequate opportunity to respond to the Government's late submission and any revision of the PSR.").

We are satisfied that there is good reason to permit the Government to proceed with its objection, and its suggestion that we employ § 2S1.3 in sentencing Defendants. Defendants have had ample opportunity to present their positions on § 2S1.3 to the Court, and they have done so. There is no reason to believe that Defendants are prejudiced by the timing of the Government's

objection.  *See United States v. Greene*, 381 F. App'x 209, 210-11 (3d Cir. 2010) (defendant was not prejudiced by Government's late objection to presentence report because defendant had adequate time to respond to Government's argument).

Moreover, the district court is obligated to correctly calculate the appropriate Guidelines range.  *United States v. Smalley*, 517 F.3d 208, 211-12 (3d Cir. 2008).  It would make little sense for a court to apply the wrong sentencing Guideline and to ignore evidence as to the proper Guideline because it was late in coming.

**B.      Applicability of U.S.S.G. § 2S1.1(a)(1)**

Section 2S1.1(a) of the Guidelines presents two alternate methods for calculating the base offense level for money laundering and engaging in monetary transactions in property derived from unlawful activity.  The section states:

> <u>Laundering of Monetary Instruments; Engaging in Monetary Transactions in Property Derived from Unlawful Activity</u>
> (a) Base Offense Level:
> > (1) The offense level for the underlying offense from which the laundered funds were derived, if (A) the defendant committed the underlying offense (or would be accountable for the underlying offense under subsection (a)(1)(A) of § 1B1.3 (Relevant Conduct)); and (B) the offense level for that offense can be determined; or
> > (2) **8** plus the number of offense levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the value of the laundered funds, otherwise.

U.S.S.G. § 2S1.1(a) (emphasis in original).[8]

The Government asserts that Defendants are "professional money launderer[s]," and that their "primary and direct conduct was illegally moving and disseminating money while evading

---

[8] Because Defendants pleaded guilty to laundering more than $20,000,000 but less than $50,000,000, the base offense level for sentencing would reflect an increase of 22 levels, to **30**. § 2B1.1(b)(1)(L).

7

banking rules, regulators, tax officials and law enforcement." (Gov't's Sent. Mem. 10.) The Government argues that Defendants were not involved in the wagering aspects of the gambling business; instead, their participation was limited solely to money laundering. (*Id*.) The Government further argues that PPC's involvement in a large, uncharged telemarketing fraud scheme should be taken into consideration in sentencing these Defendants. (*Id*. at 13-14.)[9] The Government contends that under these circumstances § 2S1.1(a)(2) of the Guidelines should apply.

Defendants contend that the funds that they were transmitting were derived from illegal gambling, that they were charged with illegal gambling, that everyone agrees that they are guilty of illegal gambling, that the Government in fact offered to accept a plea from them for illegal gambling and that since they committed the underlying offense, the Guidelines calculation should be based on § 2S1.1(a)(1).[10]

Both parties cite *United States v. Blackmon*, 557 F.3d 113 (3d Cir. 2009), which discusses the difference between the two subsections. "The Guideline distinguishes between direct money launderers under subsection (a)(1) and third-party money launderers under subsection (a)(2)." *Id*.

---

[9] The Government did not indict PPC or Defendants in regard to the telemarketing scheme. The Government further acknowledges that its proposed Guideline calculation reflects only the $44,000,000 in gambling monies discussed in the Indictment. (Gov't's Sent. Mem. 12.)

[10] The determination of whether (a)(1) or (a)(2) applies has significant ramifications. If (a)(1) applies, the Guidelines for a defendant with a criminal history category of I is 12-18 months imprisonment. The Guidelines for that same Defendant under (a)(2) is 168-210 months. The Government has conceded that the Guideline under (a)(2) is too harsh and has advised that it will seek a sentence of 60 months incarceration, which is the statutory maximum. The Government further concedes that the figure of $44,000,000 that represents the amount transmitted by Defendants overstates the seriousness of the offense to which Defendants pled. (Plea Agreements 4.)

8

at 119.[11] "Direct money launderers are those who also commit the crime that produces the illicit funds, whereas third-party launderers have no involvement in the underlying offense" beyond laundering money involved in that offense. *Blackmon*, 557 F.3d at 119 (citing U.S.S.G. App. C Amend. 634 (2001)).[12]

The Application Notes to Section 2S1.1 provides specific limitations on the use of subsection (a)(2). "Subsection (a)(2) applies to any case in which (i) the defendant did not commit the underlying offense; or (ii) . . . the offense level for the underlying offense is impossible or impracticable to determine." U.S.S.G. § 2S1.1 cmt. 3(A). The Third Circuit, in *Blackmon*, was more explicit: "If either of the two conditions for a direct launderer cannot be met, then the defendant is sentenced as a third-party launderer under subsection (a)(2)." *Blackmon*, 557 F.3d at 119.

Under the circumstances, we look to the nature of Defendants' conduct, and whether both conditions set forth in subsection (a)(1) have been satisfied. Although Defendants' pleas of guilty were to operating an unlicensed money transmission business, there is no question that this case is about gambling. Defendants were indicted on nine separate gambling-related charges.

---

[11] This distinction reflects an amendment made by the United States Sentencing Commission, which in 2001 altered the Guidelines and "tie[d] offense levels for money laundering more closely to the underlying conduct that was the source of the criminally derived funds." *See* U.S.S.G. App. C Amend. 634 (2001).

[12] The Third Circuit noted that, unlike in this case, "a defendant sentenced under subsection (a)(1) often gets a higher sentence than a less culpable offender sentenced under subsection (a)(2)." *Blackmon*, 557 F.3d at 119. In *Blackmon*, the defendant, who had been sentenced pursuant to (a)(1), argued that he should have been sentenced under (a)(2) despite the fact that he had been convicted of conspiracy to distribute cocaine, for which purpose he had laundered money. The Third Circuit, noting his involvement in the underlying offense, affirmed the district court's application of (a)(1).

Defendants transmitted $44,000,000 on behalf of offshore gambling companies. While Defendants did not enter pleas of guilty to the underlying gambling offenses, there is no doubt that they were involved in committing them. (*See* Stipulation.)[13] Indeed, Defendants acknowledge their guilt and the Government acknowledges that prior to Defendants' changes of plea, Defendants had been offered a plea to illegal gambling. (Sept. 10 Hr'g Tr. 29-30, 35.)

The parties agree that Defendants were involved in a gambling enterprise. Section 1955, the federal anti-gambling statute under which Defendants were indicted, applies to anyone who "conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business." 18 U.S.C. § 1955(a).

Defendants received information about bettors' identities and winnings from offshore gambling companies and paid those bettors. (Stipulation ¶ 2.) Defendants also paid offshore gambling companies' vendors. (*Id.*) While Defendants were not involved in managing the actual wagers (*id*. at ¶ 3), direct involvement with games of chance is not required to sustain a conviction under the federal anti-gambling laws. Paying off the winners in a gambling operation is an integral part of conducting the operation. The term "conducts" in Section 1955 is understood to include all participants in the enterprise except customers. *United States v. Riehl*, 460 F.2d 454, 459 (3d Cir. 1972); *see also Sanabria v. United States*, 437 U.S. 54, 70-71 n.26 (1978) (confirming view shared by *Riehl* court and sister circuits); *United States v. Banki*, 685 F.3d 99, 115 (2d Cir. 2011) (Section 1955 "reaches not only the upper, but also the lower,

---

[13] The Third Circuit has held that "relevant conduct" under U.S.S.G. § 1B1.3 is a "relevant consideration for sentencing judges when calculating the base offense level for direct money launderers under § 2S1.1(a)(1)." *Blackmon*, 557 F.3d at 124. For the purpose of sentencing, facts underlying relevant criminal conduct need only be proved by a preponderance of the evidence. *See United States v. Grier*, 475 F.3d 556, 568 (3d Cir. 2007) (en banc).

echelon of a gambling business, including agents, runners, independent contractors, and salesmen") (citations omitted); *United States v. Rieger*, 942 F.2d 230, 233-34 (3d Cir. 1991) (minor participants in the gambling enterprise are nevertheless accountable under Section 1955); *United States v. Zannino*, 895 F.2d 1, 10 (1st Cir. 1990) (Section 1955 "applies even to individuals who have no role in managing or controlling the business and who do not share in its profits"); *United States v. Cesaro*, 467 F.2d 653, 656 (3d Cir. 1972) ("conduct" includes "any participation in the operation of the gambling business"). Neither Defendants nor the Government contests the fact that Defendants were involved in conducting the enterprise, and the Government has offered no reason why we should depart from the traditionally broad understanding of "conducts" in Section 1955.

The second element of subsection (a)(1)—that we can determine the appropriate offense level for the offense committed—is clearly satisfied. Guidelines Section 2E3.1(a)(1) provides for a base offense level of "**12**, if the offense was (A) engaging in a gambling business; (B) transmission of wagering information; or (C) committed as part of, or to facilitate, a commercial gambling operation." U.S.S.G. § 2E3.1(a)(1).[14] This Guideline appears to apply to Defendants' crimes.

The Government cites to *United States v. Dhafir*, 577 F.3d 411 (2d Cir. 2009), in support of its contention that this Court should adopt a flexible approach. (Sept. 10, Hr'g Tr. 13-14.) In *Dhafir*, the Court of Appeals for the Second Circuit vacated a district court's use of (a)(2) instead of (a)(1); the district court had agreed with the Government that applying (a)(1) would perversely

---

[14] Defendants concede that U.S.S.G. § 2E3.1(a)(1), not U.S.S.G. § 2E3.1(a)(3), applies to the instant situation. (D. Hellinger Sent. Mem. 18.)

result in a lower sentence than applying (a)(2). *Dhafir*, 577 F.3d at 413. The Second Circuit, emphasizing repeatedly the "factual ambiguities in this case" and "the ambiguous circumstances such as these," *id*. at 415, remanded to "permit the district court to consider whether a different sentence would result from the application of [a] more flexible approach." *Id*.

The Second Circuit suggested avoiding the question of the appropriate Guidelines assessment in favor of a "more flexible and . . . more direct approach of arriving at a more appropriate sentence outside the Guidelines." *Id*. While the Second Circuit determined that this approach is consistent with its precedent, *see id*. (citing *United States v. Crosby*, 397 F.3d 103, 112 (2d Cir. 2005) ("precise calculation of the applicable Guidelines range may not be necessary . . .")), the Third Circuit has not sanctioned a similarly flexible approach. Although sentencing is a "discretionary exercise" in the wake of *Booker*, "*Booker* contemplates that the district court will impose a discretionary sentence **after** consideration of the advisory Guidelines . . . *Booker* does not contemplate that the court will somehow arrive at its sentence prior to sentencing." *United States v. Vampire Nation*, 451 F.3d 189, 197 (3d Cir. 2006) (emphasis in original). While this case presents a close question, we cannot abdicate our responsibility to properly calculate Defendants' advisory Guidelines range.[15]

Defendants "committed the underlying offense," and "the offense level for that offense

---

[15] Several Defendants raise the "rule of lenity" as a justification for applying subsection (a)(1). (D. Hellinger Sent. Mem. 24; R. Hellinger Sent. Mem. 16; Hr'g Tr. 40-41.) "When Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity." *Bell v. United States*, 349 U.S. 81, 83 (1955). However, "[t]he rule of lenity applies only if, after seizing everything from which aid can be derived, we can make no more than a guess as to what Congress intended." *Reno v. Koray*, 515 U.S. 50, 65 (1995) (citations omitted). In this case, neither Congress' intent nor the proper application of the Guideline are ambiguous.

can be determined." Accordingly, when balancing subsections (a)(1) and (a)(2), we find subsection (a)(1) is more directly applicable.[16]

### C. Applicability of U.S.S.G. § 2S1.3

The Government now argues that "§ 2S1.3 squarely applies to the convictions in this case . . . [and] is the appropriate Guideline section to be applied here." (Gov't's Supp. Mem. 1.) The Government notes that according to the Guidelines' Statutory Index, Sections 2S1.1 and 2S1.3 both apply to convictions under 18 U.S.C. § 1960. (*Id*. at 1-2.) Section 2S1.3 is to be applied when the conviction reflects violation of 18 U.S.C. § 1960(b)(1)(A) or (b)(1)(B), which refer to money transmitting businesses which operate without state or federal licenses or in violation of 31 U.S.C. § 5330. (*Id*. at 2 (citing U.S.S.G. App. A.).)

Section 2S1.3(a)(2) applies a base offense level of "**6** plus the number of offense levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the value of the funds, if subsection (a)(1) does not apply." U.S.S.G. § 2S1.3(a)(2). Because Defendants entered pleas of guilty to laundering more than $20,000,000 but less than $50,000,000, the base

---

[16] Donald Hellinger raises a case from the Middle District of Florida, *United States v. Schuett*, Crim. No. 10-39 (M.D. Fla.). (D. Hellinger Sent. Mem. 21-23.) Donald Hellinger states that the sentencing court applied (a)(1) "to conduct closely resembling that of Mr. Hellinger." (*Id*. at 21.) Although Donald Hellinger correctly notes that the *Schuett* court used (a)(1) as the basis for sentencing the defendant, who had pleaded guilty to illegal money transmission under Section 1960 in connection with gambling monies, *Schuett*'s utility is limited for several reasons. The defendant in *Schuett*, an alien, pleaded guilty to an information and cooperated extensively with the Government, and the Government agreed to a downward departure because of this cooperation. (*Id*. at 22 n.9; *Schuett*, ECF No. 60.) Defendants here have not cooperated with the Government, and the Government has made no such recommendation. Furthermore, because the defendant in *Schuett* waived his right to grand jury presentment, the *Schuett* court did not make specific findings about (a)(1), and the Government did not articulate a specific position on (a)(1), the record is too sparse to allow us to conclude that we should be bound or persuaded by a potentially analogous district court case.

offense level would reflect an increase of 22 levels, to **28**. U.S.S.G. § 2B1.1(b)(1)(L). After applying the appropriate adjustments, Defendants' Offense Level computation under sentencing Guideline § 2S1.3 is **31**. With a Criminal History Category I, the Sentencing Table recommends a sentence of 108 to 135 months. With a Criminal History Category II, the Sentencing Table recommends a sentence of 121 to 151 months. Both sentencing levels exceed the statutory maximum prescribed by 18 U.S.C. § 1960, which is 60 months. *See* 18 U.S.C. § 1960. There is no contention that subsection (a)(1), which applies only to defendants convicted under 31 U.S.C. § 5318 or § 5318A, is relevant here.[17]

The Government argues that Count 2 of the Indictment, to which Defendants entered pleas of guilty, includes language which "precisely and exclusively tracks the language of § 1960(b)(1)(B)." (Gov't's Supp. Mem. 2 (emphasis deleted).) Count 2 of the Indictment charges that the Defendants:

> knowingly conducted, controlled, managed, supervised, directed or owned all or part of a money transmitting business, which business affected interstate or foreign commerce in some manner or degree, while failing to comply with the money transmitting business registration requirements under Title 31, United States Code, Section 5330, or regulations prescribed under that section.

(Indictment 7.) This closely tracks the language of 18 U.S.C. § 1960(b)(1)(B), which provides that whoever:

> knowingly conducts, controls, manages, supervises, directs or owns all of part of an unlicensed money transmitting business, shall be fined in accordance with this title or imprisoned not more than five years, or both. As used in this section, the term "unlicensed money transmitting business" means a money transmitting business which affects interstate or foreign commerce in any manner or degree and . . . fails to comply with the money transmitting business registration

---

[17] The Government has not raised the possibility that additional enhancements under § 2S1.3(b) might apply to Defendants here.

requirements under Section 5330 of title 31, United States Code, or regulations prescribed under such section.

18 U.S.C. § 1960(b)(1)(b).

Defendants argue that applying § 2S1.3 to a violation of 18 U.S.C. § 1960, when a subsection has not be identified, is contrary to the spirit of 18 U.S.C. § 3553(a)'s objectives. (Defs.' Resp. 2.) We disagree. Considering the fact that the language of the statute mirrors Count II of the Indictment to which Defendants entered pleas of guilty and considering Defendants' conduct, we find that § 2S1.3 comports with "the nature and circumstances of the offense . . . ." 18 U.S.C. § 3553(a)(1).

Defendants also raise the "rule of lenity" as a reason not to apply § 2S1.3. (Defs.' Resp. 3.) We agree with the Government that the rule of lenity does not apply here. Irrespective of the Government's equivocation with regard to the most appropriate sentencing guideline provision, we are not presented with "a grievous ambiguity or uncertainty in the statute." *United States v. Flemming*, 617 F.3d 252, 270 (3d Cir. 2010) (quoting *Muscarello v. United States*, 524 U.S. 125, 138-39 (1998)). Instead, we face a situation where there are two guidelines, § 2S1.1(a)(1) and § 2S1.3, which are both plausibly applicable.[18] Contrary to the rule of lenity, the Sentencing Guidelines advise that when two Guideline provisions are equally applicable, the Court is to apply the provision with the greater offense level. That is, of course, § 2S1.3. *See* U.S.S.G. §

---

[18] Where courts have encountered uncertainty with regard to the proper guideline to be applied, and there is "more than one sufficiently analogous guideline . . . the district court [should] apply the most analogous one." *United States v. Cothran*, 286 F.3d 173, 177 (3d Cir. 2002) (finding no specific sentencing guideline for a violation of 49 U.S.C. § 46507 and relying on § 2X5.1 to find the most analogous guideline provision); *see also United States v. Osborne*, 164 F.3d 434, 437 (8th Cir. 1999) (same). Based on our analysis of § 2S1.1(a)(1) and § 2S1.3 and the facts and circumstances of the case, we find that § 2S1.3 is the "more analogous" guideline.

1B1.1, cmt. 5 ("Where two or more guideline provisions appear equally applicable, but the guidelines authorize the application of only one such provision, use the provision that results in the greater offense level."); *see also United States v. Vigil*, 476 F. Supp. 2d 1231, 1282 (D. N.M. 2007) (applying § 2C1.1 over § 2B3.3 and citing to § 1B1.1 to reflect "the Guidelines . . . philosophical preference throughout for the higher sentence").

In addition, we are not persuaded that the application of § 2S1.1(a)(1) is equal to, let alone preferable to, the application of § 2S1.3. Application Note 2(b) to § 2S1.1(a)(1) provides as follows:

> [i]n order for subsection (a)(1) to apply, the defendant must have committed the underlying offense or be accountable for the underlying offense under § 1B1.3(a)(1)(A). The fact that the defendant was involved in laundering criminally derived funds after the commission of the underlying offense, without additional involvement in the underlying offense, does not establish that the defendant committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused the underlying offense.

U.S.S.G. § 2S1.1 cmt. 2(b). Based on Defendants' conduct, transmitting money derived from illegal gambling, we conclude that while § 2S1.1(a)(1) is applicable, *see supra* at Section III.b., § 2S1.3 appears to be the more appropriate Guideline.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Objections to the Pre-Sentence Investigation Report are dismissed, and the Government's Objections are sustained.

An appropriate Order follows.

                                                **BY THE COURT:**

                                                */s/R. Barclay Surrick*
                                                **U.S. District Judge**